UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

————————

DAVID MURRAY,

      Plaintiff,

vs.

CITY OF DETROIT, a Michigan municipal
Corporation,

      Defendant.

Case No.

Hon.

_____/

James C. Baker (P62668)
STERLING ATTORNEYS AT LAW, P.C.
Attorney for Plaintiff
33 Bloomfield Hills Pkwy., Ste. 250
Bloomfield Hills, Michigan 48304
(248) 644-1500
jbaker@sterlingattorneys.com
_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff David Murray, by his attorney James C. Baker of Sterling Attorneys at Law, P.C., for his Complaint and Demand for Jury Trial, submits the following claims:

*Jurisdiction and Parties*

1. This action is for employment discrimination, specifically sex discrimination, *quid pro quo* and hostile work environment sexual harassment, disability discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 USC 2000e *et seq.*; Michigan's Elliott-Larsen Civil Rights

Act, MCL 37.2101 *et seq.*; the Americans with Disabilities Act of 1990, 42 USC §12111 *et seq.*; and Michigan's Persons with Disabilities Civil Rights Act, MCL §37.1101 *et seq.*; all arising out of Plaintiff's employment with Defendant.

2.     Plaintiff David Murray (hereinafter "Plaintiff," "David," "Mr. Murray," or "Plaintiff Murray") is an individual who resides in Detroit, Michigan, within the Eastern District of Michigan.

3.     Defendant City of Detroit is a Michigan municipal corporation, organized and conducting governmental functions in Detroit, Michigan, within the Eastern District of Michigan, and it is responsible for the control and oversight of its departments, agencies, facilities, and employees, including the Detroit Police Department.

4.     The events giving rise to this cause of action occurred within the Eastern District of Michigan.

5.     This Court has subject matter jurisdiction of Plaintiff's claims pursuant to 28 USC 1331 (federal question), 28 USC 1343 (civil rights) and 28 USC 1367 (supplemental jurisdiction).

6.     Plaintiff timely files this Complaint within 90 days of receiving his EEOC right to sue notice; the right to sue was issued on January 24, 2023.

7.     Plaintiff has exhausted all necessary administrative remedies prior to filing the instant lawsuit.

## BACKGROUND FACTS

8.     Plaintiff is an African-American man.

9.     Plaintiff began working for the City of Detroit, Detroit Police Department on March 7, 2022 as Human Resources/Employee Consultant II.

10.     On March 7, 2022 Plaintiff informed the Executive Manager about pre-existing back injuries he received from a previous car accident; the Executive Manager requested documentation supporting the injuries, advising that she handled disability issues within the department, and would assist him with the accommodation of getting an ergonomic office chair and other office equipment.

11.     On April 22, 2022, Plaintiff was working late with HR Manager II Bridget Lamar-Jackson ("Bridget") setting up for a career fair the next day.

12.     While setting up, Plaintiff moved a chair, thus aggravating his back injury, causing him to physically respond to the pain.

13.     Bridget came up behind Plaintiff, asked him if he was okay, and began rubbing Plaintiff's lower back.

14.     Plaintiff was surprised by her actions, he jerked away, causing additional pain to shoot through his lower back.

15.     On May 3, 2022, Plaintiff overheard a conversation between co-workers whereby one co-worker was accused of wearing tight-fitting pants; that co-worker turned to Plaintiff and others admonishing them to stop trying to "check out his imprint."

16.    HR Manager I Chanel Jenkins-Baldwin ("Chanel") was present but did nothing to address the comments.

17.    On May 4, 2023, Plaintiff was working in his cubicle when Bridget joined him to show him something on his computer; Plaintiff got up and moved out of the cubicle so that Bridget could sit down at his computer.

18.    Plaintiff then sat down next to Bridget and, after she asked him to grab a binder for her, Bridget placed her hand on Plaintiff's inner thigh.

19.    Plaintiff tried to hand her the binder at which time she moved her hand up his thigh near his groin before removing it saying something akin to "I'm sorry, I wasn't paying attention."

20.    Later on that day, Plaintiff asked Bridget and Chanel if he could move his workspace to another area as the employees seated around him engaged in near-constant sexual conversation like the comments from the day before, as well as horseplay to the point where he was hit by a co-worker and was almost knocked over.

21.    Bridget and Chanel assured Plaintiff they would investigate and hold a follow-up meeting; no follow-up happened, no move was authorized, and his co-workers did not alter their behaviors.

22.    On June 3, 2022, Plaintiff was walking past the conference room when he was called into the room by Bridget to provide an update on a recruitment he was working on.

23.     The room was darkened as Bridget claimed she had a headache.

24.     When Plaintiff sat at the conference room table opposite Bridget, she told him to sit in the chair next to her, tapping the seat as she was speaking.

25.     Plaintiff moved closer to her, but kept an open chair between them, after which Bridget instructed him to "come here," telling him "I don't bite … unless people ask me;" all the while tapping the seat of the chair next to her.

26.     Feeling to compelled to obey, Plaintiff sat in the chair next to Bridget, she pulled her chair close to his, and placed her hand on his thigh, patting it, as if she was trying to get his attention.

27.     Bridget proceeded to rub Plaintiff's thigh moving her hand up toward his groin, then back to his knee, while asking him about his weekend.

28.     Plaintiff nervously reached for a drink and Bridget reached out, put her hand on his, and said "I have a question for you … it's kind of personal."

29.     Before he could say anything, Bridget instructed Plaintiff to go and get his recruitment file.

30.     When he returned to the conference room Bridget was not there, Plaintiff sat back down, squirmed a bit because of the back pain he suffers from, at which time Bridget returned to the conference room, closed the door, saw Plaintiff squirm, and asked him what was wrong.

31.     She put some papers down and started rubbing Plaintiff's neck telling him he was really tense.

32.     Stunned, Plaintiff moved away from Bridget and said something like "my wife wouldn't like that, she's pretty jealous;" to which Bridget said "oh stop it," and mumbled "I didn't know you were married."

33.     On June 6, 2022, Plaintiff met with the Executive Manager about his previous accommodations request, she asked him how things were going.

34.     Plaintiff started to explain he was having problems with Bridget, at which time the Executive Manager cut him off telling him "no Dave, you are wrong. That's not it. You two need to talk. I'm trying to tell you that's not it, that's not it. I wish I could tell you, but I can't."

35.     Plaintiff continued to report how Bridget was "touchy feely," and how she had rubbed his back and neck.

36.     The Executive Manager laughed dismissively, to which Plaintiff objected and then explained how Bridget had touched his groin area.

37.     At that, the Executive Manager told Plaintiff she would be speaking with the Director.

38.     Later the Executive Manager walked by Plaintiff and said she had not forgotten about him; there was no report to, nor follow up by the Director.

39.     On June 10, 2022, Plaintiff attended a performance review meeting with Bridget, Chanel, and Brandi Jenkins, Plaintiff's trainer.

40.     During that performance review meeting, Bridget, Chanel, and Brandi told Plaintiff they were aware that training was been difficult in the first 3 months due to a lack of a formal training plan, to which Plaintiff agreed

41.     Overall, Brandi reported Plaintiff was doing well, and had helped her with her workload.

42.     On June 13, 2022 Plaintiff informed Defendant he was exposed to COVID through contact with his girlfriend, after which Bridget and Plaintiff spoke, she asked him questions about how often he spent time with his girlfriend, if they lived together, and then suddenly became loud telling him that because his test was negative anyway, he could work.

43.     As the call was ending Plaintiff heard Bridget say "this motherf***er ain't married!"

44.     When Plaintiff showed up to the building later, Chanel laughed at him and said "Bridget said you can bring you're a** to work."

45.     When he arrived in the office he was treated strangely by his co-workers, he was asked why he came in if he was exposed to COVID, after which he felt awkward and embarrassed; Plaintiff informed Chanel and Bridget he was going to make a complaint to MIOSHA for their disclosure of his personal health information to his co-workers.

46.    On June 23, 2022 Plaintiff received a copy of his performance review from June 10; both he and his trainer Brandi were shocked by the negative written comments made by Bridget and Chanel.

47.    On July 2, 2022, Plaintiff was in a conference room when Bridget walked up to him saying "good morning," followed up with "you look very handsome today," she looked him up and down and said, "I need your body," followed up with "I'm sorry, I need your body downstairs with me," citing the heavy workload for which she needed Plaintiff's help; Plaintiff spent the rest of that day with Bridget doing very little work.

48.    On July 9, 2022, Plaintiff was working at an offsite job fair, he approached the Director of Police Personnel, Katrina Patillo ("Director Patillo" or "Director"), and asked to speak to her.

49.    Plaintiff asked Director Patillo if the Executive Manager had spoken to her about Bridget, to which the Director asked what was the issue.

50.    Plaintiff informed her about Bridget's physical touching and how the written review was very different – much worse – than what was discussed on June 10th.

51.    Plaintiff expressed his discomfort and explained that he felt he was being retaliated against; he reported the work environment was unprofessional.

52.     Director Patillo asked "are you sure," and then told Plaintiff she heard he and Bridget had a good working relationship; Plaintiff responded they did not.

53.     The Director told Plaintiff to meet with Bridget and Chanel to discuss the performance review, and said she would also reach out to Bridget and Chanel and get back to him.

54.     Director Patillo also told Plaintiff she would handle the sexual harassment allegations and not to mention that further; there was no follow up from the Director.

55.     On July 13, 2022, a co-worker approached Plaintiff and told him Bridget and another manager, Aletha, were saying Plaintiff was having sex with his trainer, Brandi; the co-worker reported that management thought Plaintiff was recording events at the office and that management wanted Plaintiff fired.

56.     Plaintiff sent an email to Bridget, Chanel, and Director Patillo, challenging the negative comments on his performance review, and reported the lack of details supporting the negative comments and lack of direction stated in the written evaluation; Bridget said she would provide a detailed response but never did.

57.     On July 13, 2022, Plaintiff filed a complaint with the Detroit Civil Rights Department.

58.   July 14, 2022, Plaintiff overheard Chanel saying she believed Plaintiff was having sex with his trainer.

59.   Later that same day, Plaintiff was called into the conference room to meet with Bridget, Brandi, and another co-worker, he sat down, and almost immediately Bridget grabbed his inner thigh near his groin; it was below the table so the other two in the room could not see.

60.   On July 15, 2022 Plaintiff filed a complaint with MIOSHA regarding the COVID disclosure issue.

61.   On July 20, 2022 Plaintiff met with a peer support representative relative to a hostile work environment claim he filed, he reported to the representative he was experiencing a high level of stress due to the hostile work environment, and that the stress was triggering his Atrial Fibrillation (AFib).

62.   During that meeting Plaintiff was called to meet with the Director.

63.   The peer support representative informed Plaintiff he would be put on sick leave for the rest of the day; Plaintiff was told not to return to work and that he should go home as sick.

64.   Plaintiff was still ordered to report to the Director's office.

65.   As Plaintiff was attempting to leave work, his badge was deactivated, he was ordered by a security officer to return to the office, he received a call that he was to turn in his laptop, and only after he turned in his laptop would he be allowed to go home.

66.    On August 11, 2022 Plaintiff was given a doctor's prescription requesting the reasonable accommodation that he be removed from the hostile and stressful work environment.

67.    Plaintiff met with the Executive Manager who told him the request could not be accommodated and the City of Detroit, Detroit Police Department might have to terminate him if he continued to request the accommodation.

68.    On August 25, 2022 Plaintiff reported to the Executive Manager that, despite his request for relief from the hostile work environment, Bridget was still interacting with him.

69.    On August 29, 2022 Plaintiff overheard Bridget telling the Executive Manager she thought Plaintiff and another co-worker were "f***king," that the two were having sex in the conference room; Bridget referred to Plaintiff and the other co-worker as "lovebirds."

70.    On September 1, 2022 the Director announced a departmental audit because of several internal complaints filed against HR management.

71.    On September 6, 2022 Plaintiff was called into a room with the Director and Chanel, the two said he had poor work behavior and poor work performance, and Chanel reported Plaintiff was being terminated.

72.    Plaintiff was provided written notice of the purported reasons supporting his separation from employment with the City of Detroit, Detroit Police Department.

73.    Plaintiff had not been presented with the performance issues contained in his termination notice, and Plaintiff had never been counseled, threatened with written counseling or discipline, nor had he been written up for the performance issues identified in the September 6 "Recommendation on Performance Status."

74.    The performance examples given were pretext for discrimination, harassment, and were retaliatory against Plaintiff having reported the discrimination, harassment, and hostile work environment he was forced to work with and in.

75.    After his termination, Plaintiff sought and was offered employment with the Third Judicial Circuit Court for Wayne County.

76.    After being offered the position, while he was negotiating compensation with the Court, Defendant by its agents and employees, including those who were employed at the time Plaintiff worked for the City of Detroit, retaliated further against Defendant by interfering with his employment opportunity with the Court.

77.    Because of the retaliation by Defendant et al., the Third Judicial Circuit Court withdrew its offered employment to Plaintiff.

78.    Defendant's actions during his employment and since have resulted in serious financial and emotional hardship to Plaintiff.

79.    Defendant, by its agents and employees, engaged in unfair and discriminatory and retaliatory treatment against Plaintiff, created and maintained a severe and pervasive hostile work environment on the basis of *quid pro quo* sexual harassment, failed to accommodate Plaintiff's reasonable request that he be removed from a harmful work environment that was creating and exacerbating a physical disability, all culminating in Plaintiff's unjustified termination and denial of further employment opportunities.

## COUNT I

### DISCRIMINATION AND *QUID PRO QUO* SEXUAL HARASSMENT IN VIOLATION OF TITLE VII

80.    Plaintiff incorporates the preceding paragraphs by reference.

81.    At all material times, Plaintiff Murray was an employee and Defendant City of Detroit was his employer covered by and within the meaning of Title VII of the Civil Rights Act of 1964, 42 USC 2000-e *et seq.*

82.    Title VII prohibits sex discrimination, including sexual harassment.

83.    Defendant by its agent and manager subjected Plaintiff to unwanted sexual comments and conduct, which were severe and pervasive, and which constituted a sexually hostile work environment.

84.    Plaintiff's submission to his manager's unwelcomed sexualized conduct and requests for sexual touching and gratification were express or implied conditions of his employment, including training and job continuation.

85.    The conduct at issue was intentional and willful, and engaged in with malice or with reckless disregard to the rights and sensibilities of Plaintiff.

86.    With knowledge of the severity and pervasiveness of the harassment, Defendant failed to take prompt remedial action to end the harassment.

87.    As a direct and proximate result of those actions, the terms, conditions, and benefits of Plaintiff's employment were adversely affected.

88.    As a direct and proximate result of the Defendant's wrongful and discriminatory treatment of Plaintiff, Plaintiff has suffered injuries and damages, including but not limited to, loss of past, present, and future earnings and earning capacity; loss of the value of fringe and pension benefits; mental and emotional distress, including anxiety and mental anguish; humiliation and embarrassment; and loss of the ordinary pleasures of everyday life, including the right to seek and pursue gainful occupation of choice.

## COUNT II

### RETALIATION IN VIOLATION OF TITLE VII

89.    Plaintiff incorporates the preceding paragraphs by reference.

90.    Title VII prohibits retaliation against persons who complain about sex discrimination, including sexual harassment.

91.    Plaintiff engaged in Title VII protected activity when he complained of and opposed unlawful discrimination, harassment, and retaliation.

92.     Defendant's retaliatory treatment of Plaintiff as set forth above, including issuing him poor performance reviews and termination was in violation of the anti-retaliation provisions of Title VII.

93.     Post-employment conduct by Defendant's employees and former employees resulted in Plaintiff being offered, then being refused employment, with said conduct being retaliatory in violation of Title VII.

94.     The actions of Defendant by its agents were intentional, in deliberate disregard for the rights and sensibilities of Plaintiff.

95.     As a direct and proximate result of the Defendant's wrongful and retaliatory treatment of Plaintiff, Plaintiff has suffered injuries and damages, including but not limited to, loss of past, present and future earnings and earning capacity; loss of the value of fringe and other benefits; mental and emotional distress, including anxiety and mental anguish; humiliation and embarrassment; and loss of the ordinary pleasures of everyday life, including the right to seek and pursue gainful occupation of choice.

## COUNT III

### DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILIITIES ACT OF 1990

96.     Plaintiff incorporates the preceding paragraphs by reference.

97.    At all material times, Plaintiff was an employee and Defendant was his employer, covered by and within the meaning of the Americans with Disabilities Act (ADA) of 1990, 42 USC 12111 et seq.

98.    Plaintiff is a person with a disability as defined by the ADA.

99.    Defendant, by its agents and employees, discriminated against, harassed, and refused to accommodate Plaintiff's disability.

100.   The accommodation sought by Plaintiff did not impose an unreasonable burden on Defendant.

101.   Defendant failed in good faith to participate in an interactive process regarding Plaintiff's request for accommodation.

102.   The discriminatory practices at issue were intentional and willful, and engaged in with malice or with reckless indifference to the rights and sensibilities of Plaintiff.

103.   As a direct and proximate result of those actions, the terms, conditions, and privileges of Plaintiff's employment were adversely affected and he was illegally fired.

104.   As a direct and proximate result of the Defendant's wrongful and discriminatory treatment of Plaintiff, he has suffered injuries and damages, including, but not limited to, loss of past, present, and future earnings and earning capacity; loss of the value of fringe and other benefits; mental and emotional distress, including anxiety and mental anguish; humiliation and

embarrassment; and loss of the ordinary pleasures of everyday life, including the right to seek and pursue gainful employment.

## COUNT IV

### SEX DISCRIMINATION AND *QUID PRO QUO* SEXUAL HARASSMENT IN VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT

105.   Plaintiff incorporates the preceding paragraphs by reference.

106.   At all material times, Plaintiff was an employee and Defendant was his employer covered by and within the meaning of Michigan's Elliott-Larsen Civil Rights Act (ELCRA) MCL 37.2101, *et seq.*

107.   Michigan's ELCRA prohibits sex discrimination, which includes sexual harassment.

108.   Defendant by its agents and manager subjected Plaintiff to unwanted sexual comments and conduct, which was severe and pervasive, and which constituted a sexually hostile work environment.

109.   Plaintiff's submission to his manager's unwelcomed sexualized conduct and requests for sexual touching and gratification were express or implied conditions of his employment, including training and job continuation.

110.   The conduct at issue was intentional and willful, and engaged in with malice or with reckless disregard to the rights and sensibilities of Plaintiff.

111. With knowledge of the severity and pervasiveness of the harassment, Defendant failed to take prompt remedial action to end the harassment.

112. As a direct and proximate result of those actions, the terms, conditions, and benefits of Plaintiff's employment were adversely affected.

113. As a direct and proximate result of the Defendant's wrongful and discriminatory treatment of Plaintiff, Plaintiff has suffered injuries and damages, including but not limited to, loss of past, present, and future earnings and earning capacity; loss of the value of fringe and pension benefits; mental and emotional distress, including anxiety and mental anguish; humiliation and embarrassment; and loss of the ordinary pleasures of everyday life, including the right to seek and pursue gainful occupation of choice.

## COUNT V

### RETALIATION IN VIOLATION OF
### THE ELLIOTT-LARSEN CIVIL RIGHTS ACT

114. Plaintiff incorporates the preceding paragraphs by reference.

115. The Elliott-Larsen Civil Rights Act prohibits retaliation against persons who complain about sex discrimination, including sexual harassment.

116. Plaintiff engaged in protected activity when he complained of and opposed unlawful discrimination, harassment, and retaliation.

117.   Defendant's retaliatory treatment of Plaintiff as set forth above, including issuing him poor performance reviews and termination was in violation of the anti-retaliation provisions of ELCRA.

118.   Post-employment conduct by Defendant's employees and former employees resulted in Plaintiff being offered, then being refused employment, with said conduct being retaliatory in violation of Title VII.

119.   The actions of Defendant by its agents were intentional, in deliberate disregard for the rights and sensibilities of Plaintiff.

120.   As a direct and proximate result of the Defendant's wrongful and retaliatory treatment of Plaintiff, Plaintiff has suffered injuries and damages, including, but not limited to, loss of past, present and future earnings and earning capacity; loss of the value of fringe and other benefits; mental and emotional distress, including anxiety and mental anguish; humiliation and embarrassment; and loss of the ordinary pleasures of everyday life, including the right to seek and pursue gainful occupation of choice.

## COUNT VI

## DISCRIMINATION IN VIOLATION OF THE
## MICHIGAN PERSONS WITH DISABILITIES CIVIL RIGHTS ACT

121.   Plaintiff incorporates the preceding paragraphs by reference.

122.   At relevant times, Plaintiff was an employee and Defendant was his employer covered by and within the meaning of Michigan's Persons with Disabilities Civil Rights Act (MPWDCRA). MCL 37.1101 *et seq.*

123.   Michigan's PWDCRA prohibits discrimination on the basis of a disability.

124.   Plaintiff informed, and Defendant was aware of his diagnosed disability associated with both a pre-existing injury and the hostile work environment in which he was forced to work.

125.   Defendant, by its agents, treated Plaintiff differently, discriminated against him, subjected him to unreasonable conditions of employment, failed or refused to engage in an interactive process, refused his request for reasonable accommodations, and terminated his employment due to his disability.

126.   The discriminatory practices at issue were intentional and willful, and engaged in with malice or with reckless disregard to the rights and sensibilities of Plaintiff.

127.   As a direct and proximate result of those actions, the terms, conditions and benefits of Plaintiff's employment were adversely affected.

128.   As a direct and proximate result of the Defendant's wrongful and discriminatory treatment of Plaintiff, Plaintiff has suffered injuries and damages, including but not limited to, loss of past, present and future earnings and earning capacity; loss of the value of fringe and pension benefits; mental and emotional

distress, including anxiety, humiliation, and embarrassment; loss of the ordinary

pleasures of everyday life, including the right to pursue gainful employment.

## RELIEF REQUESTED

Wherefore, for the foregoing reasons, Plaintiff David Murray demands

judgment against Defendant City of Detroit as follows:

1.  Compensatory damages in an amount he is found to be entitled;

2.  Exemplary damages in an amount he is found to be entitled;

3.  Punitive damages in an amount he is found to be entitled;

4.  Liquidated damages in an amount he is found to be entitled;

5.  Lost wages and benefits in an amount he is found to be entitled;

6.  Interest, costs, and statutory attorney fees as damages; and

7.  Whatever other legal relief appears appropriate and just.

## JURY DEMAND

Plaintiff Orlando D. Russell requests a trial by jury.

Respectfully submitted,

STERLING ATTORNEYS AT LAW, P.C.

By:   /s/ James C. Baker
          James C. Baker (P62668)
          Attorney for Plaintiff
          33 Bloomfield Hills Pkwy., Ste. 250
          Bloomfield Hills, MI 48304
          (248) 644-1500
          jbaker@sterlingattorneys.com

Dated: April 21, 2023